UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
J.Q. DOE,                           )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )   Civil Action No. 05-0690 (PLF)
                                    )
UNITED STATES DEPARTMENT OF THE     )
TREASURY, INTERNAL REVENUE SERVICE, )
                                    )
        Defendant.                  )
_____ )

OPINION

This is a lawsuit brought under the Privacy Act, 5 U.S.C. § 552a. Plaintiff J.Q. Doe is a former employee of the IRS who has been permitted to proceed under a pseudonym. She alleges that the IRS improperly disclosed Privacy Act-protected records pertaining to her and thereby caused her to suffer actual damages. On March 30, 2009, this Court issued an Order and Judgment granting the IRS's motion for summary judgment, entering judgment in the IRS's favor, and noting that "[a]n Opinion explaining the Court's reasoning will follow." Doe v. IRS, Civil Action No. 05-0690, Order and Judgment (D.D.C. Mar. 30, 2009).[1] This Opinion sets forth the Court's reasoning for granting the IRS's motion for summary judgment and entering judgment in favor of the IRS.

---

[1] The papers submitted in connection with this matter include: Defendant IRS's Motion for Summary Judgment ("Mot."); Plaintiff's Opposition to Defendant IRS's Motion for Summary Judgment ("Opp."); and Reply In Support of Defendant IRS's Motion for Summary Judgment ("Reply.").

I.  BACKGROUND

Ms. Doe worked for the IRS for more than 12 years.  At the time of the events in question, she was employed as the Chief of the Systems Development Branch of the Internal Revenue Service.  See Plaintiff's Statement of Material Facts ¶ 4 ("Pl.'s Facts").  In or about September 2001, one of Ms. Doe's subordinates, Gerald M. Fenton,

> contacted a job applicant [who applied for a position at the IRS in 2000] . . . and told that applicant [that] he was not selected . . . because [Ms. Doe] had discriminated against [the applicant] on the basis of [the applicant's] sexual orientation.  Mr. Fenton [also] told the job applicant [that Mr. Fenton] would testify for the applicant if legal action based on Fenton's allegations was pursued.

Opp. at 2.  Apparently, Mr. Fenton's accusation against Ms. Doe was based on a derogatory statement about the applicant's sexual orientation that Ms. Doe allegedly made in Mr. Fenton's presence.  See Pl.'s Facts ¶ 19.  The applicant then filed a discrimination complaint against Ms. Doe, and the IRS Equal Employment Opportunity office and the Office of Special Counsel ("OSC") commenced an investigation into the matter.  See id. ¶ 20.  Mr. Fenton and other IRS employees were interviewed as part of this investigation.  See id. ¶¶ 14, 24.

According to Ms. Doe, the other two IRS employees who were present when she allegedly made the derogatory remark failed to corroborate Mr. Fenton's story.  See Pl.'s Facts ¶ 21.  Nevertheless, "the OSC was prepared to recommend disciplinary action against [Ms. Doe] for the non-selection of the applicant."  Opp. at 3.  Thus, "in order to put a lengthy investigation to rest," Ms. Doe entered into a settlement agreement with the IRS and the OSC in or about July 2003.  Pl.'s Facts ¶ 10.  In that settlement agreement, Ms. Doe acknowledged that the reason she failed to hire the applicant was "not merit-based," Mot., Ex. 1, Settlement Agreement ¶ 1

2

("Settlement Agreement"), and the parties agreed that Ms. Doe would be suspended without pay for 45 days, detailed to a non-management position for one year, and subject to other disciplinary measures.  Id. ¶ 2.  The parties also agreed to include a confidentiality provision in the Settlement Agreement.  Specifically, the Settlement Agreement provided that

> [n]either OSC nor the [IRS] shall disclose the terms of [the Settlement Agreement] and/or the facts and issues relating to and/or addressed in [the OSC file relating to the investigation] to any person and/or entity, except as provided for in paragraph 8 [of the Settlement Agreement], and as otherwise required by law, upon request of a Congressional committee with jurisdiction over the matter, and as may be needed for any law enforcement purpose.

Id. ¶ 6.  Paragraph 8 of the Settlement Agreement provided that

> OSC shall issue a press release that does not contain [Ms. Doe's] name.  Prior to issuing the press release, OSC will give [Ms. Doe] and her attorney and the [IRS] an opportunity to review the draft press release.  OSC will consider their comments, but is under no obligation to negotiate over the content of the press release.

Id. ¶ 8.

The OSC issued its press release on June 20, 2003.  See Mot., Ex. 2, Press Release, U.S. Office of Special Counsel, U.S. Office of Special Counsel Secures Corrective and Disciplinary Action in Case of Federal Job Applicant Denied Job Because of His Homosexuality (June 20, 2003) ("OSC Press Release"). (Ms. Doe does not argue that the OSC Press Release violated the Privacy Act or the Settlement Agreement.  See Opp. at 4.)  Soon thereafter, the Washington Post carried an article about the Settlement Agreement.  See Mot., Ex. 3, Stephen Barr, In IRS Bias Case, Special Counsel Brings About Suspension and Settlement, WASHINGTON POST (June 26, 2003) ("Post Article").  The Post Article "did not reveal [Ms. Doe's] name or discuss details of the investigation beyond the facts in the OSC press release."  Opp. at 4.

3

When Mr. Fenton learned of the Post Article, he wrote a lengthy e-mail to two of his superiors at the IRS, Peggy Carpenter and Rick Hynek. In that e-mail, Mr. Fenton wrote:

> The information within the article seems to vindicate me in my struggles through the last three years within this organization. I think it plainly points to who was telling the truth and who was lying in this issue. For a brief moment I thought this would end the retaliation and ostracism I have suffered over the past few years from those in management at the highest levels of CISO. I told the truth, I did the right thing, but instead of being supported by my management I was shunned and ostracized. After thinking about it for a while I realized that nothing would probably change. My section and I will continue to be attacked by SD management with Mr. Hynek's blessing, and decisions will continue to be made that usurp any authority my organization holds as well as its purpose. CISO will continue to try to force me to resign my management position and Mr. Hynek will continue to support [Ms. Doe] at any expense. This organization is so corrupt that few see what is right and what is wrong any more. I doubt that any of the punishment outlined in this article will ever take place. With right and wrong so clearly defined by this article one has to ask how upper management can be so blind as to the right thing to do. . . . I will continue to do the right thing and I will do everything within my power to see that the true story behind these events is eventually told. Everyone who participated in this travesty needs to be identified and those who practiced retaliation need to be punished for their roles in this even if they do sit in the front office.

Opp., Ex. 10, E-mail Message from Gerald Fenton to Peggy Carpenter and Rick Hynek (July 7, 2003 at 3:12 p.m.). In response, Ms. Carpenter wrote:

> First of all, the terms of the agreement reached by the Office of Special Counsel which must be adhered to, state that the identity of those involved not be revealed so obviously Rick [Hynek] and I are adhering to those terms.
>
> Secondly, an agreement reached by the Office of Special Counsel is binding to the agency and you can be assured that the terms discussed in the article will be adhered to including the suspension and removal from management for one year.

> Thirdly, Rick and I are both troubled by the overall perception that you seem to have that you are being ostracized and that the authority of your section has been impacted in some negative way. We do not see that and feel we have made several good faith efforts to ensure that you and your staff are not being retaliated against in any way. Obviously you perceive this differently and it might be a good idea for the three of us to meet and understand your concerns.

Opp., Ex. 10, E-mail Message from Peggy Carpenter to Gerald Fenton and Rick Hynek (July 8, 2003 at 11:43 a.m.).

Approximately ten days after this e-mail exchange, the Washington Blade newspaper carried another article about the Settlement Agreement. See Mot., Ex. 5, Joe Crea, IRS Manager Suspended for "Queer" Epithet, WASHINGTON BLADE (July 18, 2003) ("Blade Article"). Unlike the Post Article, the Blade Article quoted Mr. Fenton at length. It also included (1) Ms. Doe's real name; (2) specifics as to what precisely Ms. Doe allegedly said about the applicant's sexual orientation; and (3) other information not included in the OSC Press Release. See Pl.'s Facts ¶ 47. Mr. Fenton denies that he "provide[d] information concerning [the] investigations or . . . disciplinary actions taken against plaintiff to [the Blade] or any other media, either directly or indirectly." Mot., Ex. 10, Declaration of Gerald M. Fenton ¶ 5 (May 16, 2008) ("Fenton Decl.").[2] He admits, however, that he shared his knowledge about the events underlying the OSC investigation with individuals inside and outside the IRS. See Opp., Ex. 9, Deposition of Gerald M. Fenton at 157-61, 184-88, 199-200 (Oct. 19, 2007) ("Fenton Dep.").

---

[2] Mr. Fenton has offered no explanation for why the Blade purports to quote him directly. Michael Perez, a friend of Mr. Fenton's, claims that Mr. Fenton told him that Mr. Fenton "contacted the [Washington Blade] and spoke[] with the [writer of the Blade Article] about the plaintiff" prior to the publication of the Blade Article. Opp., Ex. 11, Declaration of Michael Perez ¶ 9 (Sept. 9, 2008).

Ms. Doe claims that, upon learning of the Blade Article, she "literally fell apart emotionally[.]" Pl.'s Facts ¶ 65. She further claims that the disclosures in the Blade Article caused her to suffer injuries including "direct and indirect injury to [her] reputation," physical pain and suffering, mental anguish, damage to her career, and certain out-of-pocket pecuniary losses. Complaint ¶ 26. She therefore brought suit against the IRS, alleging that the agency violated the Privacy Act in three specific ways:

> when [Mr. Fenton] willfully and intentionally disclosed information regarding the plaintiff that is protected by the Privacy Act to a news reporter [at the Washington Blade] and others without plaintiff's consent [in violation of Section 552a(b) of the Privacy Act], and when the IRS failed to keep an accounting of its unauthorized disclosures as required by [Section 552a(c)]. [Moreover,] [p]rior to making the disclosure(s), [Mr. Fenton] did not assure the accuracy or completeness or relevance for agency purposes of the information that was disclosed as required by [Section 552a(e)(6)].

Opp. at 1.[3]  The IRS argues that no violation of the Privacy Act occurred, see Mot. at 5-8, and that even if a violation occurred, Ms. Doe suffered no damages. See id. at 8-9.

II.  STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986);

---

[3] Ms. Doe's complaint sets forth identical Privacy Act claims against the OSC, but she voluntarily dismissed her claims against OSC on September 30, 2008. In addition, Ms. Doe has abandoned her claims against the IRS under Sections 552a(e)(9) and 552a(e)(10) of the Privacy Act. See Opp. at 1 n.1.

Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006).

On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). She is required to provide evidence that would permit a reasonable jury to find in her favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. To defeat a motion for summary judgment, a plaintiff must have more than "a scintilla of evidence to support [her] claims." Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).

III.  GOVERNING LAW

*A.  Overview*

As the D.C. Circuit has explained:

The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records. It does so by allowing an individual to participate in ensuring that his records are accurate and properly used, and by imposing responsibilities on federal agencies to maintain their records accurately.

Bartel v. Fed. Aviation Admin., 725 F.2d 1403, 1407 (D.C. Cir. 1984) (footnotes omitted).  One way the Act "safeguards the public from unwarranted . . . dissemination of personal information" is by limiting the circumstances under which an agency may disclose, without consent, "records" about an individual maintained within a "system of records."  5 U.S.C. § 552a(b).[4]  The Act also requires agencies to "keep an accurate accounting of . . . the date, nature, and purpose of each disclosure of a record to any person or to another agency," 5 U.S.C. § 552a(c), and requires agencies to "make reasonable efforts to assure that . . . records are accurate, complete, timely, and relevant for agency purposes" before disclosing them.  5 U.S.C. § 552a(e)(6).

Ms. Doe seeks monetary damages, costs and attorneys' fees for the IRS's alleged violations of these three provisions under Section 522a(g)(1)(D) (providing a "catch all" cause of action for plaintiffs adversely affected by an agency's failure to abide by any of the Privacy Act's substantive provisions) and Section 522a(g)(4) of the Privacy Act (limiting monetary relief in such suits to cases in which the agency's action was "intentional or willful" and the plaintiff

---

[4]  In this case, there is no dispute that the records at issue – the records of the OSC investigation, the Settlement Agreement and the disappointed applicant's EEO complaint against Ms. Doe, see Pl.'s Facts ¶¶ 8-9 – constitute "records" maintained within a "system of records."

suffered "actual damages"). Her second and third claims (*i.e.*, that the IRS failed to record the alleged improper disclosure, and that the IRS failed to ensure that the information improperly disclosed was accurate) necessarily depend on the viability of her main claim: that is, that an improper disclosure occurred. To prevail on such a claim, a plaintiff must show that (1) the disclosed information is a "record" contained within a "system of records"; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff. See Krieger v. U.S. Dep't of Justice, 529 F. Supp. 2d 29, 41 (D.D.C. 2008); Mulhern v. Gates, 525 F. Supp. 2d 174, 181 (D.D.C. 2007). If these prerequisites are met, a plaintiff may recover monetary damages, costs and fees if she can further establish that she sustained actual damages as a result of some harm caused by the agency's disclosure. See Doe v. Chao, 540 U.S. 614, 620-21 (2004).

### B. The Retrieval Rule

Not every nonconsensual disclosure of information contained in Privacy Act-protected records constitutes a violation of the Privacy Act. Generally speaking,

> the Privacy Act only covers disclosures of information which was either directly or indirectly retrieved from a system of records. [Thus], [t]he disclosure of information derived solely from independent sources is not prohibited by the statute even though identical information may be contained in [a] system of records.

Fisher v. Nat'l Institutes of Health, 934 F. Supp. 464, 473 (D.D.C. 1996) (internal citations and quotation marks omitted). Thus, a disclosure rarely implicates the Privacy Act – even if the disclosing official "knew or had reason to believe that [the] information [disclosed] might also be found in a protected record," Doe v. U.S. Dep't of Veterans Affairs, 519 F.3d 456, 461 (8th Cir.

9

2008) – so long as the disclosing official obtained the information disclosed from sources not covered by the Privacy Act, such as the disclosing official's personal knowledge. The reasons generally given for this so-called "retrieval rule" are: (1) "it would create an 'intolerable burden' to impose liability for disclosures of independently acquired information," and (2) doing so would "extend the Act beyond its purpose" of "preclud[ing] a system of records from serving as the *source* of personal information about a person that is then disclosed without the person's prior consent.'" Id. (quoting Olberding v. U.S. Dep't of Defense, 709 F.2d 621, 622 (8th Cir. 1983)). See also Bartel v. Fed. Aviation Admin., 725 F.2d 1409-11.

### C.  The Bartel Exception

The D.C. Circuit has recognized an exception to the retrieval rule for cases in which an inflexible application of that rule would permit agencies to flout the purposes of the Privacy Act. See Bartel v. Fed. Aviation Admin., 725 F.2d at 1411. In Bartel, FAA supervisor Brian Vincent requested an official investigation into an apparent violation of the Privacy Act by one of his subordinates, Richard Bartel.

> Documents collected pursuant to that investigation were placed in a Report of Investigation (ROI). The investigation was closed . . . after the United States Attorney declined prosecution in favor of administrative action by the FAA. . . . [Mr. Vincent later] decided that a letter of reprimand to Bartel was appropriate. No such letter was ever issued, however, [because Mr. Bartel left the FAA for another position soon thereafter].

Id. at 1405-06. Mr. Bartel later sought reemployment with the FAA. When Mr. Vincent discovered this, he discussed the earlier investigation of Mr. Bartel with other FAA officials and determined, based on those discussions, that Mr. Bartel had violated the Privacy Act. He then

informed several FAA employees (and a non-FAA organization to which Mr. Bartel had also applied) that (1) Mr. Bartel had been investigated during his earlier tenure at the FAA, and (2) based on that investigation, Mr. Vincent believed that Mr. Bartel had violated the Privacy Act. See id. at 1406. Mr. Bartel brought suit – ironically enough – under the Privacy Act. The FAA argued that no violation had occurred because Mr. Vincent never actually read the ROI. Rather, argued the FAA, the information and determination that Mr. Vincent disclosed came solely "from his independent knowledge of the investigation and its results," and therefore its disclosure did not violate the Privacy Act. Id. at 1407. The district court dismissed plaintiff's complaint, but the D.C. Circuit vacated the dismissal and remanded for further proceedings.

The D.C. Circuit first noted that there appeared to be a genuine factual dispute as to whether Mr. Vincent actually read the ROI – and thus whether he actually "retrieved" information from the ROI – before he made the offending disclosures. See Bartel v. Fed. Aviation Admin., 725 F.2d at 1408-09. The court of appeals then went on to conclude that it was not necessary for Mr. Vincent to have read the ROI in order for his disclosure to constitute a violation of the Privacy Act. See id. at 1409-10. The court of appeals acknowledged that a strict application of the retrieval rule might dictate a different conclusion, but that it made little sense to apply the retrieval rule strictly to the particular facts of Bartel because doing so would defeat the purposes of the Privacy Act. As the court of appeals later explained:

> [In Bartel we] recognized that earlier decisions had limited liability under the Act to instances in which the disclosed information had been "retrieved" from a system of records. On the facts . . . before us [in Bartel], however, that standard would have allowed an official to "circumvent [the Privacy Act] with respect to a record he himself initiated by simply not reviewing [the record] before reporting its contents or conclusions." We therefore found the

>  retrieval rule inapposite in order to avoid an "interpretation [that] would deprive the Act of all meaningful protection of privacy."

Pilon v. U.S. Dep't of Justice, 73 F.3d 1111, 1118 (D.C. Cir. 1996) (quoting Bartel v. Fed. Aviation Admin., 725 F.2d at 1409, 1411).  Thus, Bartel stands for the proposition that the retrieval rule must give way to the purposes of the Privacy Act under certain circumstances.  In particular, the retrieval rule will not protect an agency from liability under the Privacy Act "when an official disclose[s] his personal recollection of an investigation that he had instituted, despite the fact that he may not have reviewed the actual investigatory record before doing so."  Pilon v. U.S. Dep't of Justice, 73 F.3d at 1118.  See also Bartel v. Fed. Aviation Admin., 725 F.2d at 1411 ("[I]t would hardly seem an intolerable burden to restrict an agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-related role that he acquired the information in the first place.") (internal quotation marks omitted).[5]

## IV.  DISCUSSION

The IRS contends that (1) Bartel's exception to the retrieval rule does not apply to Ms. Doe's case, and (2) the IRS therefore is entitled to summary judgment because the retrieval rule bars Ms. Doe's improper disclosure claim (and the other two claims which depend on her improper disclosure claim).  The Court granted the IRS's motion for summary judgment on March 30, 2009 because it agrees with the IRS on both points.

---

[5]  Similarly, in Wilborn v. U.S. Dep't of Health & Human Services, 49 F.3d 597, 600 (9th Cir. 1995), *abrogated on other grounds by* Doe v. Chao, 540 U.S. 614 (2004), the Ninth Circuit recognized an exception to the retrieval rule where an agency official disclosed information contained in a report he created, even though "he may not have physically retrieved the disclosed information from" that record before disclosing it.

### A. The <u>Bartel</u> Exception Does Not Apply

<u>Bartel</u>'s exception to the retrieval rule is a narrow one that should be applied only in cases turning on similar facts and raising similar concerns. That is evident from the language of <u>Bartel</u> itself. See <u>Bartel v. Fed. Aviation Admin.</u>, 725 F.2d at 1408-09 (twice noting the case's "peculiar circumstances"); <u>id</u>. at 1409 (stating that a "rigid adherence to the 'retrieval standard' makes little sense *in this case*") (emphasis in original); <u>id</u>. (declining to rule that the Privacy Act's coverage is restricted to information directly retrieved from a record "*in the factual context of this case*") (emphasis in original). Several judges have reached this same conclusion. See <u>Doe v. U.S. Dep't of Veterans Affairs</u>, 519 F.3d at 462; <u>Armstrong v. Geithner</u>, Civil Action No. 07-1963, 2009 WL 1117970, at *3 (D.D.C. April 27, 2009); <u>Krieger v. U.S. Dep't of Justice</u>, 529 F. Supp. 2d at 47-48; <u>Fisher v. Nat'l Institutes of Health</u>, 934 F. Supp. at 474; <u>Krowitz v. U.S. Dep't of Agriculture</u>, 641 F. Supp. 1536, 1543-44 & n.6 (W.D. Mich. 1986).

<u>Bartel</u>'s narrow exception to the retrieval rule has no applicability here because this case is easily distinguishable from <u>Bartel</u>. As the IRS points out:

> Unlike the supervisor in <u>Bartel</u> . . . Fenton did not initiate the investigation of plaintiff . . . , he did not make any official determinations as to plaintiff's culpability or to any disciplinary actions which should be taken against her (because, though Fenton was *a* supervisor, he was not *plaintiff's* supervisor), and he had no knowledge of the progress or outcome of the investigation [beyond the fact that he was interviewed] until OSC's press release was picked up and printed by the Post.

Reply at 8. Stated differently, unlike the supervisor in <u>Bartel</u>, Mr. Fenton did not "institute[]" the investigation of Ms. Doe, <u>Pilon v. U.S. Dep't of Justice</u>, 73 F.3d at 1118; nor did he have a "primary role in creating and using" Ms. Doe's Privacy Act-protected records. Moreover, as

explained below, there is no evidence that any information Mr. Fenton disclosed was acquired from a "record-related role." Bartel v. Fed. Aviation Admin., 725 F.2d at 1411.

Thus, because the facts of this case are so different from those of Bartel, and because unlike Bartel nothing about this case raises concerns about frustrating the purposes of the Privacy Act, the retrieval rule applies. Ms. Doe therefore is incorrect to argue that she may avoid summary judgment even if there is no evidence that Mr. Fenton "never saw or had access to [her Privacy Act-protected records] himself." Opp. at 14.

### B. There Is No Evidence of Retrieval

The IRS argues that even if Mr. Fenton disclosed information to third parties, there is no evidence that any of the information he disclosed was derived from Privacy Act-protected records rather than from his own personal knowledge of events. The IRS reasons that it therefore is entitled to summary judgment because all of Ms. Doe's claims are predicated on the idea that an *improper* disclosure occurred. See Reply at 2.

The Court agrees. First, there is no evidence that Mr. Fenton had actual access to the physical records or to electronic versions of those records, and thus no evidence to suggest that he directly retrieved any information from those records. Indeed, it appears from the parties' papers that this point is not disputed. See generally Opp. (failing to allege that Mr. Fenton had actual access to records). See also Fenton Decl. ¶ 4 (denying Mr. Fenton accessed any official records); Mot., Ex. 5, Deposition of J.Q. Doe at 65 (Oct. 18, 2007) (QUESTION [by opposing counsel]: "Would [Mr. Fenton] have had access to your official personnel file?" ANSWER [by Ms. Doe]: "He shouldn't have, no." QUESTION: "Do you have any good reason to believe that he did?" ANSWER: "No." QUESTION: "Did Mr. Fenton have any access to the OSC file?"

14

ANSWER: "Not that I'm [aware] of." QUESTION: "He doesn't work for the Office of Special Counsel, does he?" ANSWER: "He does not." QUESTION: "Would he have any access to [the] EEO file regarding [the applicant who initiated the discrimination complaint against Ms. Doe after being contacted by Mr. Fenton]?" ANSWER: "He should not." QUESTION: "Is there any reason to believe that he did? ANSWER: "No.").

Second, there is no evidence that Mr. Fenton otherwise had access to the records. Ms. Doe argues that others revealed the contents of those records to Mr. Fenton, and thus that Mr. Fenton "retrieved" information from the records indirectly. For example, Ms. Doe argues that Ms. Carpenter revealed the contents of those records when she replied to Mr. Fenton's e-mail message in the wake of the Post Article. See Opp. at 12. See also Pl.'s Facts ¶ 41. But Ms. Carpenter's reply does not contain any information that had not already been disclosed. Indeed, it does not even confirm Mr. Fenton's theory that Ms. Doe was the subject of the Post Article. See supra at 4-5. Ms. Doe also argues that OSC investigators revealed details of the OSC investigation to Mr. Fenton when those investigators interviewed Mr. Fenton. See Pl.'s Facts ¶¶ 14-15. This claim is unsupported by the record as well. See Fenton Dep. at 149.

Third, while neither party addresses the point, the Court observes that this is not a case in which the timing and substance of the disclosure at issue provide circumstantial evidence of retrieval. For example, in Doe v. U.S. Postal Service, 317 F.3d 339 (D.C. Cir. 2003), the D.C. Circuit concluded that a jury could infer that an agency official retrieved information from a protected record because (1) "the disclosures occurred after [plaintiff] submitted his FMLA form[, which contained the confidential information at issue, to the agency]," thereby suggesting that the official who allegedly disclosed the information "got the information from the form," and

(2) the evidence indicated that the official who allegedly disclosed the information routinely reviewed such FMLA forms. See id. at 342-43. That line of reasoning is inapplicable here. While the Blade Article indisputably appeared after the OSC investigation, all of the information attributed to Mr. Fenton in the Blade Article (which is to say, all of the information that Mr. Fenton allegedly disclosed to the Blade in violation of the Privacy Act) can be traced to the OSC Press Release or to Mr. Fenton's personal knowledge. Thus, a jury could not infer from the timing and substance of the Blade Article that Mr. Fenton retrieved information from Ms. Doe's Privacy Act-protected files before disclosing the information.

In short, there is no evidence that Mr. Fenton directly or indirectly retrieved information from Ms. Doe's Privacy Act-protected records before (allegedly) disclosing it. In fact, all of the evidence on this point indicates that the records at issue were adequately protected and disclosed only to the extent permitted by the Privacy Act and the Settlement Agreement. See, e.g., Mot., Ex. 8, Declaration of Robert Buggs ¶¶ 4-12 (June 11, 2008) ("Buggs Decl.").[6]

Nevertheless, Ms. Doe argues that because Mr. Fenton "had access to all of the confidential facts . . . appearing in the Blade article, [and because he] received that information as part of his official duties," he was barred by the Privacy Act from disclosing those facts.

---

[6] The Privacy Act permits agencies to disclose protected records to officials "who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The IRS argues, and Ms. Doe agrees, that under this provision the IRS was permitted to disclose information to the small number of officials responsible for implementing Ms. Doe's discipline – which the IRS did. See Buggs Decl. ¶¶ 7-12. Ms. Doe at one point attempts to conflate Ms. Carpenter's e-mail to Mr. Fenton with these Section 552a(b)(1) disclosures, see Pl.'s Facts ¶ 42, perhaps to suggest that Mr. Fenton "retrieved" information from disclosures the IRS made under Section 552a(b)(1). This is misleading but immaterial because, as discussed above, Ms. Carpenter's e-mail did not reveal any information that had not been revealed before; Mr. Fenton therefore was not able to "retrieve" anything from that e-mail.

Opp. at 14. In other words, she appears to argue that Mr. Fenton was barred from disclosing any information that made its way into Privacy Act-protected records as a result of the OSC investigation, even if Mr. Fenton gained that information in the first instance from personal experience. She takes this position, it seems, on the ground that whatever personal knowledge Mr. Fenton possessed was based on incidents that occurred at work. See, e.g., Pl.'s Facts ¶¶ 14-15. This argument rests on an overly broad view of the scope of the Privacy Act. As Judge Kollar-Kotelly has pointed out:

> Under [the Privacy Act], there is a rule of retrieval, not a rule of coincidence. If there is information in a record, and a federal employee gained that same information from the use of her own senses, the employee's telling others what she saw or heard does not violate the Privacy Act merely because there is a record, subject to the Privacy Act, which also contains that information. [That is because the] Privacy Act speaks to the disclosure of records; it does not create a monastic vow of silence which prohibits governmental employees from telling others what they saw and heard merely because what they saw or heard may also be the topic of a record in a protected file.

Krieger v. U.S. Dep't of Justice, 529 F. Supp. 2d at 47 (quoting Krieger v. U.S. Dep't of Justice, Civil Action No. 98-1703, Memorandum Opinion and Order at 2 (D.D.C. Feb. 15, 2001) (Facciola, M.J.)).

      For the above reasons, on March 30, 2009 the Court issued an Order and Judgment granting the IRS's motion for summary judgment and entering judgment for the IRS.

      SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: July 8, 2009